Wis.]        JANUARY TERM, 1899.              43

Northwestern National Bank of Superior vs. City of Superior.

NORTHWESTERN NATIONAL BANK OF SUPERIOR, Appellant, vs. CITY OF SUPERIOR, imp., Respondent.

*April 7 — April 25, 1899.*

*Banks and banking: Insolvency: Constitutional law: Banking law: Preferences.*

1. It is well settled in cases where the decision of a legislature as to its own powers is reviewed by the judiciary, that the legislature has all powers of legislation not prohibited by express words of the constitution, or by necessary implication therefrom; that the unconstitutionality of a statute must be clear and manifest before a court should declare it; and that if there be any reasonable doubt as to its constitutionality the statute should be upheld.

2. The provisions of sec. 3245, Stats. 1898, directing a preference to the United States, the state, and any county, city, town, or village therein, out of the assets of an insolvent corporation in process of being closed up pursuant to the statutes, as applied to banks, does not violate either the express words of the constitution, or any necessary implication therefrom, or that of the banking act (ch. 479, Laws of 1852); and the legislature is not prohibited from regulating, in common with other corporations, the administration of insolvent banking corporations and the distribution of their assets.

3. The banking act (ch. 479, Laws of 1852) was not an attempt to codify all laws which should in any way affect, control, or regulate banking corporations, but to provide for the creation of particular corporations with certain peculiar powers, and to enact a body of special provisions required for some of the peculiar and distinguishing business of such corporations and individuals similarly engaged, leaving the banking corporation so created a member of the business and commercial community, to be regulated by the laws governing other individuals and corporations therein, except so far as the very act itself has defined the differences.

4. The methods of procedure, in case of insolvency of banking corporations, the remedies of creditors, and the rights of the latter in the assets rest under the general law in relation thereto as it stood at the time of the passage of ch. 479, Laws of 1852, or as it might thereafter be prescribed by the law-making power. The banking act does not extend over those subjects, and such general laws were not adopted into the banking law so that they could not thereafter be changed.

Northwestern National Bank of Superior vs. City of Superior.

5. The banking act containing no express provisions as to the manner
   of distribution of assets in case of insolvency, and such proceedings
   being supplied by general legislation, it cannot be said that the
   general purpose and scheme of that act was that all the creditors
   of a banking corporation should share equally in the assets, and
   the preference given certain creditors by sec. 3245, Stats. 1898, is
   valid.

APPEAL from a judgment of the superior court of Douglas
county: A. J. VINJE, Judge.   *Affirmed.*

Action brought by the *Northwestern National Bank of
Superior*, for itself and other creditors, against the State
Trust & Savings Bank of Superior, an insolvent corporation,
for the appointment of a receiver, winding up the corpora-
tion and its affairs, and a distribution of its assets.   The de-
fendant bank was thereupon adjudged insolvent.   W. H.
Slack was duly appointed receiver, and an order entered in
the action directing notice to be given to all creditors of
defendant, and granting leave to creditors to become parties
plaintiff by filing their claims.   The city of *Superior* filed
its claim, and prayed that in the distribution of assets its
claim be preferred to the claim of plaintiff and other credit-
ors, for the reason that it was a city or municipal corpora-
tion.   The trial court adjudged the city of *Superior* was a
municipal corporation, and that its claim was preferred under
the provisions of secs. 3217–3245, Stats. 1898, and directed
that the receiver pay in full, out of the assets of defendant,
the claim of the city of *Superior* in preference to, and be-
fore paying any part of the claim of, the other creditors.
From this portion of the judgment the *Northwestern National
Bank of Superior* took its appeal.

For the appellant there was a brief by *Ross, Dwyer &
Hanitch*, and oral argument by *Louis Hanitch*.

For the respondent there was a brief by *Champ Green*,
and oral argument by *A. C. Titus*.

DODGE, J.   In settling the affairs of the State Trust & Savings Bank, a banking corporation organized under the laws of Wisconsin, the receiver was adjudged to give preference to the claim of the city of *Superior*, which was a creditor for a deposit account to a considerable share of the total indebtedness.   The *Northwestern National Bank of Superior*, also a large creditor, appeals.

The only question presented is whether the provisions of sec. 3245, Stats. 1898, in directing a preference to the United States, the state, and any county, city, town, or village therein, out of the assets of an insolvent corporation in process of being closed up under the statutes, is, as applied to banks, constitutional.

Two rules have become general as a guide when the decision of the legislature as to its own powers is reviewed by the judiciary: First. That, while the Congress has only such powers as are affirmatively given to it, the legislature of a state has all powers of legislation from which it is not prohibited by express words of the constitution, or by necessary implication therefrom.   6 Am. & Eng. Ency. of Law (2d ed.), 933, 934; *Bushnell v. Beloit*, 10 Wis. 195, 221.   Second.   The unconstitutionality of a statute must be clear and manifest before a court should declare it, and, if there be any reasonable doubt as to its constitutionality, it should be upheld. 6 Am. & Eng. Ency. of Law (2d ed.), 1085; 3 Am. & Eng. Ency. of Law (1st ed.), 673 *et seq.; Dickson v. State*, 1 Wis. 122, 126; *State ex rel. Grundt v. Abert*, 32 Wis. 403.   Applying these rules, and keeping in mind that a co-ordinate branch of the government, much better constituted to understand and effectuate the will of the people, has deliberately enacted the statute in question, that it has passed substantially without change through two revisions of the general statute law, and that for more than twenty-five years full faith has been accorded it and rights of great magnitude, both public and private, have been rested upon it without

substantial dissent, we approach the question whether, by any affirmative provision of the constitution or necessary implication therefrom, the legislature was prohibited from enacting as law this provision which they have deemed wise and for the public welfare.

The only express limitation upon the power of the legislature over banking corporations, as distinguished from others, is found in Const. art. XI, sec. 4, which declares that the legislature "shall not have power to create, authorize or incorporate, by any general or special law, any bank, or banking power or privilege whatever, except as provided in this article." Sec. 5 provides that the legislature may submit to the people the question of "bank" or "no bank;" and, in the event of an affirmative vote, it shall have power to grant bank charters, and to pass a general banking law, with such restrictions and under such regulations as it may deem expedient for the security of the bill holders; provided, that no such grant or law shall have any force or effect until the same shall have been submitted to a vote of the electors of the state and approved. After a preliminary affirmative vote, the banking law (ch. 479, Laws of 1852) was enacted by the legislature and submitted to the people, and by them adopted. That act, among other things, contained sec. 48: "This act may be amended by any future legislature, but no amendment thereto shall take effect or be in force until it shall have been submitted to a vote of the electors of the state," etc.

It will thus be seen that the only express prohibitions upon the legislature are against "creating, authorizing or incorporating any bank, or banking power or privilege, or any institution or corporation having any banking power or privilege;" and, secondly, the *amending* of the banking act adopted in 1852.

In *State ex rel. Reedsburg Bank v. Hastings*, 12 Wis. 47, it was said (page 51): "This was a substantial reservation to

the people themselves of all legislative power upon the subject of banks and banking." This was said, however, merely with reference to the provision specifying the method of taxation, to emphasize the fact that such provision emanated from the people and not from the legislature, so that constitutional restrictions upon the legislature would not invalidate that particular act; the people not being restrained by any constitutional provision. The question of the scope of the banking act was not before. the court.

At a very early day it was pointed out and distinctly held that the constitutional restriction now urged was not universal, and did not preclude the legislature from passing some general laws which might affect banks in common with other individuals or corporations. In *Rock River Bank v. Sherwood*, 10 Wis. 230, the general legislation of 1856, providing, as a penalty for the taking of usury, the forfeiture of all interest, was held applicable to a state bank and within the constitutional power of the legislature, for the reason that the banking act made no provision with reference to penalty, although it did fix the rate of interest to be charged by banks. That case was followed and supplemented by *Brower v. Haight*, 18 Wis. 102, wherein the penalty of the then existing usury law of 1859, which forfeited the entire debt, was applied. The objection was distinctly made, and based on *State ex rel. Reedsburg Bank v. Hastings, supra*, that such legislation could not be constitutional, as applied to banks, but was overruled; the court, by PAINE, J., saying: "Here there is no question about invalidating or affecting any provision of the banking law. The respondent's counsel is undoubtedly right in assuming, as a necessary consequence of the decision in the *Hastings Case*, that a mere act of the legislature is not capable of changing or amending the banking law, and we have so decided in *Van Steenwyck v. Sackett*, 17 Wis. 645. But there is no such question presented here, and it by no means follows that, because that law cannot be amended by the legislature, the banks existing under

it cannot be affected by, or subject to, any other law. On the contrary, it is very obvious that they may be and are. Thus the mode and measure of redress for most wrongs that may be committed by banks in common with other persons are not provided for in the banking law, but are to be looked for in the general legislation concerning remedies. And they are changed, as against banks, whenever that general legislation is changed. Thus, if a bank leases premises and refuses to deliver possession on the expiration of the lease, it is not in the banking law that the remedy is to be found, but in the statute concerning unlawful detainer. And if that statute should be changed and rendered more stringent, imposing new penalties on the lessee for the wrong, banks would be subjected to the new statute like all other persons. And it would not do for them to say that no such liabilities were imposed by the banking law, and the legislature could not amend that law, and therefore they were not subject to the new statute. The obvious answer would be that such a statute was no attempt to amend the banking law, no attempt to change or impair any of its provisions or interfere with any rights conferred by it, no attempt to legislate upon a matter which that law had attempted to regulate. That law provided the terms and conditions on which the business of banking might be carried on. It did not attempt to provide a special, separate system of remedies against banks for wrongs which they might commit against others. It is designed to leave them subject, like all other persons, to the general laws upon those questions."

In *Rockwell v. Elkhorn Bank*, 13 Wis. 653, it was held that the general law, statute or common, regulated the dealings of banks with commercial paper and making contracts with reference thereto, and that the banking act shall be deemed restricted in its application to the particular classes of contracts specified therein, and would not be construed as extending beyond its exact terms.

In *Rush v. Van Norstrand*, 21 Wis. 161, Mr. Justice COLE,

delivering the opinion of the court, discusses at length the intended limitations resulting from the statutory prohibitions above mentioned, and, while holding an act invalid which changed the duty imposed on the comptroller by the banking act itself with reference to surrender and substitution of bonds, proceeded to say, apparently for himself, and not for the court: "It is sufficient to say that I have thought the legislature might pass such laws as experience might prove necessary and essential to carry out the principles of the original banking law, and which should more effectually guard the public against a system of unsound and wildcat banking. I do not think it could pass any law which would injuriously affect the securities given by the banking law. But while it could not impair any provisions of that law, intended to protect the public against an unsound system, it might remedy defects in the law. It might pass laws to support and enforce the banking law," etc.

In *Van Steenwyck v. Sackett*, 17 Wis. 645, above referred to by Mr. Justice PAINE, a law of 1855, which directly amended the banking act by requiring a warrant of attorney to be attached to the stockholder's bond required by that act, was held unconstitutional as a direct amendment. The court said: "We do not say that it is impossible for the legislature to impose any new duties on banking corporations, in common with others, as incidental to the exercise of other acknowledged powers of legislation. But, if such legislation were sustained, it would be upon the ground that it was not an amendment of the banking law, but a proper exercise of power outside of the scope and object of that, and by which its provisions were in no way affected."

In *Porter v. State*, 46 Wis. 375, 379, the court, speaking by RYAN, C. J., after stating the reasons for the constitutional provision, says: "As might have been expected, in the circumstances, this law contains many safeguards to protect the paper currency which it authorizes, and no con-

trol over the banks to be established under it, in any other respect. The only concern of the state was to secure, as far as it could, a safe local paper currency. . . . Indeed, that appears to be the object of every provision of the banking law, except the power conferred upon the banks themselves."

In *Garden City B. & T. Co. v. Geilfuss,* 86 Wis. 612, it was held that banking corporations, like all others, were governed by the legislation on the subject of voluntary assignments, all of which legislation was subsequent to 1852. And in *Slack v. N. W. Nat. Bank, post,* p. 57, the general law as to preferences by insolvent corporations is held applicable to banks.

In *In re Koetting,* 90 Wis. 166, the statute prohibiting insolvent banks from receiving deposits, and imposing penalty therefor, was held valid and within the power of the legislature. The constitutional provisions were reviewed, together with the decisions on the subject, and the law summed up thus: "First, the general banking act cannot be materially amended, except by a law submitted to and approved by the people; second, banks organized under that law are subject to general statutes and rules of law which apply to them alike with other corporations and persons, provided there be no impairment of the powers and privileges given them by the banking law." The court also said: "There were in existence, at the time of the enactment of the banking law, plain and clear provisions for the summary winding up of the business of any banking or insurance corporation, as soon as it became insolvent, either upon application of the attorney general or of any creditor or stockholder. R. S. 1849, ch. 114, secs. 9–12 *et seq.;* R. S. 1878, sec. 3218 *et seq.* No question has ever been raised as to the validity of these provisions, nor is it perceived how any such question could be raised. They have been acted upon and enforced in numerous cases in this court, which it is unnecessary

to cite.   This law [prohibiting deposits] deprives the bank of nothing which it had before, and affects no right guaranteed to it by the general banking law.   It is not, therefore, an amendment to the banking law, but a general law, applying alike to banks and to natural persons, which affects no banking right or privilege, but simply punishes an act, fraudulent in its nature, for which the banking law provided no punishment.   Such a law is clearly within the power of the legislature to enact."   This case was approved in *State v. Shove*, 96 Wis. 1–6.

It thus appears that the court has uniformly taken the view, which must result from a thoughtful examination of the act itself, that the banking act was not an attempt to codify all laws which should in any way affect, control, or regulate a banking corporation.   It is apparent that the scheme of that act was to provide for the creation of corporations with certain peculiar powers, and to enact a body of special provisions required for some of the peculiar and distinguishing business of such corporations and of individuals similarly engaged, leaving the corporation so created, as a member of the business and commercial community, to be regulated by the laws governing other individuals and corporations therein, except so far as the very act itself had defined the differences.   Mr. Justice PAINE, as quoted above, has pointed to the necessity of this view in certain illustrative cases.   Many others might be suggested.   As a legal entity, the bank, corporate or individual, had the power to own and transfer real estate with certain limitations, and immediately became amenable to the general laws governing registry of conveyances and to the common or statute law governing real-estate rights.   As an owner and dealer in commercial paper, it fell at once under the law merchant and under statutes regulating rights in such property.   *Rockwell v Elkhorn Bank*, 13 Wis. 653.   In the nature of things, such a corporation might incur debts and must be enabled

to sue and must be liable to be sued.  The banking act would be searched in vain either for any definition of the rights of such creditors or for the mode of procedure in suits.  But no one has ever doubted that a procedure, prescribed by law for all corporations or all natural individuals, existed and controlled suits by and against these.  Thus ch. 113, R. S. 1849, is devoted to the subject of actions at law by and, against corporations.  Ch. 114 is devoted to proceedings in chancery against corporations, and, as said in the *Koetting Case*, there never has been a doubt but that ch. 114 applied to these corporations, as well as to all others.  An attempt to exhaust the illustrations of this view would be but needless extension of this opinion.  Suffice it to say that it is perfectly clear that many of the rights, duties, obligations, and more especially remedies, applicable to corporations and individuals having or exercising banking powers, are to be found outside of the banking act, and therefore within legislative control.  It therefore becomes a question in each instance whether the subject covered by an act of legislature or by a rule of common law is fairly within the purview or scope of the banking act, so that we must find the regulation of that subject within that act or may look to the more general law.

A study of the banking act discloses that its regulations are confined to the creation of the corporation with banking powers and to the regulation of the conduct of its business while running as a bank.  Indeed, as pointed out by RYAN, C. J., in *Porter v. State*, 46 Wis. 375, apparently, the scope of the banking act hardly exceeds the field of regulating the issue of currency and protecting the bill holders, which is the purpose designated for it by the words of the constitution, though such limitation of its scope we do not here decide.  There is not an intimation from beginning to the end of that act of any attempt or purpose to regulate either the conduct of, or the remedies against, a banking

corporation after it reaches a stage of insolvency. There are but two instances in which any reference is made to the interruption of its business, and in those the provisions are rather in the nature of a weapon to compel certain conduct than a prescribing of the method of closing up the corporation. They are sec. 25, which gives the comptroller power, where the bank fails to make good depreciated security for circulation, to invoke the court's aid to stop its business by appointing a receiver, and sec. 40, where, in the event that dividends are paid out while the capital is impaired, it becomes the duty of the circuit judge to interpose to stop business by the same process. This significant omission of the banking act to extend in any respect to the condition of insolvency is pointed out by Mr. Justice Wɪɴsʟow, in the *Koetting Case*, with the intimation, which seems to me well supported by reason, that the banking act assumed only to regulate live banks, and did not intend to perpetuate insolvent ones, or to regulate the administration of their dissolution.

On the other hand, at the time the act was passed we had ch. 114, R. S. 1849, devoted largely to the methods of procedure and distribution of assets in the event of insolvency of corporations, intended to include banking corporations, for two or three of its sections apply to them expressly and others inferentially; and in that chapter have been contained all of the various provisions controlling proceedings to administer the affairs of insolvent banking corporations, in common with others, since their first existence in Wisconsin.

From these circumstances, it seems clear that the people, when exercising their sovereign discretion as to the scope of a general banking act, had decided that the methods of procedure in case of insolvency, the remedies of creditors, and the rights of the latter in the assets had been deemed a subject upon which banking corporations and individuals

were not, and ought not to be, distinguished from others, but should rest under the general law as it then stood or might thereafter be prescribed by the ordinary lawmaking power, and that the scope of the banking act ought not to be extended over those subjects. In confirmation of this view, ch. 114, R. S. 1849, with its amendments (now ch. 140, Stats. 1898), has unhesitatingly been applied by the courts to insolvent bank corporations from the earliest days up to *Gores v. Day*, 99 Wis. 276, and *Gager v. Marsden*, 101 Wis. 598.

It is argued that because, at the time the banking act was adopted, sec. 18, ch. 114, R. S. 1849, not a part of the banking act nor referred to therein, provided for a distribution of the assets of insolvent corporations to creditors "in the order and in the proportions prescribed in a voluntary dissolution of a corporation," and that at that time there was no order prescribed by statute, so that a ratable distribution was held, on equitable grounds, to be the rule,—therefore that rule must be deemed to have been adopted into the banking act, so that it could not thereafter be changed. Such contention is negatived: First, by the obvious purpose, already pointed out, of leaving banking corporations to stand with others, under the general law, as to their winding up; second, by the intrinsic evidence of the act itself which specifically named that part of the statute law which it was proposed to adopt into it (*vide* sec. 19, where the "powers and immunities incident to corporations, *as provided by chapter 54 of title 13* of the revised statutes," are conferred); and, thirdly, such construction, applied to the banking act generally, would necessitate the view that all rules of common law or statute existing in 1852 had been so adopted by the people into the banking act that no legislative change could thereafter be made therein and affect banks or bankers. If we say that the general rule of equity, in absence of statute, that assets ought to be ratably divided among creditors, was

unchangeably adopted into the banking act, we must as well say that because the penalty for taking usury at the time of the enactment of the banking act was forfeiture of three times the interest, such provision was incorporated into the banking act itself and could not be changed,— a proposition which has already been negatived. As well say that, because the law at that time did not prohibit the continuance of receipt of deposits by an insolvent corporation, the right to so continue was incorporated into the banking act itself,— a proposition which has been negatived in the *Koetting Case*. Indeed, the latter contention might have been made with much more propriety; for the bank act expressly authorized its corporations to receive deposits, and the prohibition thereof by legislation in 1876 was in derogation of an express provision. Again, the banking act being silent as to the power of a banking corporation or individual to make assignments for benefit of creditors, and as to the manner and terms of such assignments, it would be as legitimate to argue that thereby the rule of law then existing, that either a corporation or an individual could make such assignment without any statutory trammel, had been adopted and become a part of the banking act so as to preclude legislation on the subject. But there has never been any doubt that when in 1857 the method of making an assignment was prescribed, and when in the following years the various restrictions upon preferences therein were enacted, they applied as well to corporations and individuals engaged in banking business as others, and they have been so applied. *Garden City B. & T. Co. v. Geilfuss*, 86 Wis. 612.

It is further urged that we must read in the banking act a general purpose or scheme that the creditors of a banking corporation are to share equally in its assets. No support for such inference is presented, save that at the time of its enactment creditors of all corporations shared equally. The consideration is overlooked that the banking act applied as

Northwestern National Bank of Superior vs. City of Superior.

well to individuals as to corporations (sec. 45), and that as to them, and corporations as well, preferences might at that time be created or acquired by voluntary assignments; thus rendering abortive any such general scheme of equality among creditors. The contention is, however, predicated upon remarks made by the supreme court of the United States, especially in *Davis v. Elmira S. Bank,* 161 U. S. 275, where, in repudiating a law of New York giving preferences to certain depositors in national banks, it was said that such preferences were contrary to the spirit of the national banking act, which contemplated equal distribution among creditors. But that case, and other analogous federal decisions, find this general purpose and spirit in the very words of the national banking act itself. That act contained just that which is conspicuously absent in our banking law, namely, the express provision as to the manner of distribution in case of insolvency. The national banking act expressly directs the taking possession of the bank by the comptroller, the appointment of a receiver, regulates the receiver's proceedings in realizing assets, and finally directs the comptroller, from the proceeds, " to make a ratable dividend of the money paid over to him on all such claims as may have been proved." It also prohibits and makes void preferences in contemplation of insolvency. This is the distinguishing feature between the two laws, and it is the feature upon which the supreme court of the United States dwelt in *Davis v. Elmira S. Bank, supra,* and it was to that language that the New York provisions were held repugnant which provided for priority to certain depositors. In *Cook Co. Nat. Bank v. U. S.* 107 U. S. 445, 448, the court said: " We consider that [the national bank] act as constituting by itself a complete system for the establishment and government of national banks. . . . Everything essential to the formation of the banks, the issue, security, and redemption of their notes, *the winding up of the institutions,*

*and the distribution of their effects,* are fully provided for."
It is this last element in the national banking act which is
absent from our own, and to supply which we have always
looked to the general legislation, amongst which is sec. 3245,
now attacked. The presence of such express provisions in
the national banking act confirms the view that their omis-
sion in the act of 1852 is significant of the purpose not to
include their subject in its scope, nor to restrict the legisla-
ture therefrom.

We conclude, therefore, that neither the express words of
the constitution, nor any necessary implication therefrom
or from the words of the banking act, prohibit the legisla-
ture from regulating the administration of insolvent bank-
ing corporations, in common with others, and the distribu-
tion of their assets. The respondent city was and is entitled
to the priority accorded it by the judgment.

*By the Court.*— Judgment affirmed.

BARDEEN, J., took no part.